**COLONIAL BANK, Plaintiff,**

v.

**Martijn L. WORMS, Defendant.**

**No. 82 Civ. 1898 (PNL).**

United States District Court, S.D. New York.

Oct. 5, 1982.

Stephen G. Austin, Cadwalader, Wickersham & Taft, New York City, for plaintiff.

Richard Sherman, Valley Stream, N.Y., for defendant.

### OPINION AND ORDER

LEVAL, District Judge.

Plaintiff Colonial Bank commenced this action on March 25, 1982, to enforce a judgment rendered against defendant Martijn L. Worms by the High Court of Justice, Queens Bench Division, Commercial Court (1981 C. No. 7741), on February 5, 1982, for the sum of $541,331.63 together with interest from the date of judgment at the rate

of 15% per annum. Defendant alleges that the judgment should not be enforced because the procedure followed by the English court was so unfair to defendant as to amount to a denial of due process and because the English court was a seriously inconvenient forum for trial of the action.

Plaintiff moves for summary judgment and defendant moves for leave to amend his answer to assert as a third affirmative defense that the judgment should not be enforced because it is based upon a contract entered into by plaintiff in violation of the Trading With the Enemy Act, 50 U.S.C. App. § 1, et seq., and the Rules and Regulations promulgated thereunder. For the reasons set forth below, defendant's motion is granted and plaintiff's motion will be granted unless defendant submits sufficient evidence by October 22, 1982 to raise a substantial question of fact as to the viability of his third affirmative defense.

*Facts and Allegations*

Colonial Bank entered into a loan agreement with Global Navigation Corporation ("Global") and Mutiny Shipping Corporation ("Mutiny") in November, 1979. In connection with the loan agreement, the Bank entered into a mortgage agreement and a deed of assignment with one or more of the companies. It also entered into an agreement with Worms, pursuant to which Worms agreed personally to guarantee payment of the loan:

The personal guarantee provides that it is governed by the laws of England and that, in the event it becomes necessary for the Bank to initiate legal proceedings against Worms, the Bank could do so in the courts of England. The guarantee further provides that Worms "will instruct lawyers to accept service of legal proceedings in [England] ... and will not contest the validity of such proceedings so far as the court or courts involved is concerned." The companies agreed to similar provisions in each of the other agreements.[1]

Worms is a Dutch national and in November, 1979, lived in London, England.

He now resides in New York. Global and Mutiny are each Liberian corporations. Colonial Bank is a Connecticut corporation and maintains an office in London. The negotiations leading to the execution of the agreements were conducted on the part of the Bank from its London office and the agreements were executed in London.

After making certain payments on the loan, Global defaulted. Colonial Bank then demanded that Worms make payment of the outstanding balance. Upon Worms' failure to do so, the Bank commenced the English action in accordance with the terms of the personal guarantee by service of process on Worms' designated agent. On October 29, 1981, Worms' solicitors acknowledged service on their client's behalf. They later caused a summons to be issued, seeking to have the action stayed pending the determination of a separate foreclosure action brought by the Bank in the Cayman Islands against Global and a ship, "Ulysses I," that was subject to the mortgage agreement. Worms' solicitors also sought and obtained an extension of time in which to answer.

The solicitors frequently complained in written and telegraphic communications with Worms that they would be unable to continue to represent him unless they received his instructions and payment for services rendered. They advised Worms that they would take no action in the case and would seek to withdraw as counsel unless payment was received. They also warned Worms in a communication dated January 29, 1982 that failure to answer by February 3, 1982 would result in the entrance of a default judgment. Despite these warnings, Worms did not pay his solicitors and did not make alternative arrangements to answer. True to their word, the solicitors did not take any further action in the case and, on February 1, 1982, sought an order pursuant to English rules of procedure allowing them to withdraw as

---

1. The mortgage agreement provides that certain of its terms are governed by Panamanian law and that the agreement is otherwise governed by English law.

**58**

Worms' counsel.[2] The court granted their request on February 4, 1982 and entered default judgment in the amount of $541,-331.63 on February 5, 1982. At some point after February 9, 1982, Worms sent an undated telex to the English court asking that the judgment be set aside. He did not formally move to have the case reopened and did not appeal from the judgment.

*Discussion*

This is a diversity action. Accordingly, the New York Uniform Foreign Country Money-Judgments Recognition Act, N.Y. Civ.Prac.Law and Rules §§ 5301–5309 (McKinney 1978), applies. The Act provides that a money judgment obtained in a foreign country is conclusive between the parties and enforceable in New York except in certain very limited circumstances. *Id.* § 5303. Significantly, New York case law has been "[s]o liberal . . . in the recognition of the judgments of foreign nations that the occasion for the use of Article 53 has been rare. It has received 'scant judicial attention' as a result." Siegel, Practice Commentary to N.Y.Civ.Prac.Law and Rules § 5301 (McKinney 1978).

Worms alleges in each of his affirmative defenses that one of the conditions exists which either precludes a New York court from recognizing a foreign judgment or enables a New York court to exercise its discretion not to recognize such a judgment.

*The First Affirmative Defense*

Worms alleges as his first affirmative defense:

> That the procedure followed by the English court in allowing the withdrawal of counsel and the entry of a default for failure of the Defendant to file timely pleadings, all without affording the Defendant any opportunity to obtain new counsel, was a procedure so unfair to the Defendant as to amount to a denial of due process . . .

Second Amended Answer & Affirmative Defenses ¶ 9.

This defense apparently attempts to rely on general notions of the requirements of due process and on N.Y.Civ.Prac.Law and Rules § 5304(a), which provides that a foreign country money judgment is not conclusive if it was rendered under a system that does not provide procedures compatible with the requirements of due process of law.

"English procedure comports with our standards of due process." *British Midland Airways Ltd. v. International Travel, Inc.,* 497 F.2d 869, 871 (9th Cir.1974); *Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 444 (3rd Cir.1971), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972). The *British Midland* and *Somportex* cases make clear that a party may not attack an English default judgment on the ground that he was denied due process where he was given reasonable notice and opportunity to present his case in the English court but failed to do so. *British Midland, supra,* at 871 ("we flatly reject the due process complaint of a party who 'was given and . . . waived the opportunity of making adequate presentation in the English Court'"). *Somportex, supra,* at 443 ("The polestar is whether a reasonable method of notification is employed and reasonable opportunity to be heard is afforded to the person affected.").

■ A brief review of the facts makes clear that Worms was not denied due process. He consented to litigate any disputes arising out of the guarantee in the English courts. He retained English solicitors. When suit was initiated (with notice to his solicitors and to him), they commenced an active defense. Worms, however, failed to supply his solicitors with instructions and failed to compensate them for services rendered. The solicitors repeatedly and fre-

---

**2.** The solicitors first sought leave to withdraw in a petition submitted on December 4, 1981. That petition was granted by order dated December 11, 1981. Thereafter, Worms apparently remitted funds and instructions to them and they reappeared and obtained an order providing Worms with an extension of time to answer. Worms then failed to pay and instruct the solicitors a second time, prompting them eventually to move on February 1, 1982, to withdraw from the case.

quently demanded payment and indicated that they would take no action in the case until payment was received. Worms ignored those demands. Finally, the solicitors advised Worms that they intended to withdraw from the case unless payment was received and warned Worms of the dire consequences of failure to answer before the deadline set by the court. Despite this warning, Worms did not remit payment and did not make alternative arrangements to answer. The solicitors then took advantage of an English procedure to withdraw from the case and a default judgment was entered.

Worms was not denied due process. He was given notice of the need to answer and had an opportunity to do so.[3] He chose not to and later failed to pursue the proper procedures to attempt to have the judgment withdrawn or reversed. Worms may now regret those decisions but the fact remains that the default judgment resulted from Worms' failure to provide for his own defense despite notice of the consequences of that failure and not from the denial of due process.

■ Worms argues that this court should not recognize the English judgment because Worms was without counsel at the time the judgment was entered and was therefore seriously disadvantaged. He cites two cases for the proposition that a foreign judgment need not be recognized in such circumstances. *Bouas v. Sociedad Maritima San Nicholas, S.A.*, 252 F.Supp. 286 (S.D.N.Y.1965); *Perdikouris v. The S/S Olympos*, 185 F.Supp. 140 (E.D.Va.1960). Those cases, however, are inapposite. Worms engaged counsel to represent him in the English action and, before they withdrew from the case, those counsel advised him that

failure to answer could result in the entry of a default judgment. Worms chose to ignore that advice.

*The Second Affirmative Defense*

■ Worms alleges as his second affirmative defense that the English judgment is not entitled to recognition because the English court was a seriously inconvenient forum for trial of the action. This defense relies on N.Y.Civ.Prac.Law and Rules § 5304(b)(7) (McKinney 1978), which provides that "[a] foreign country judgment need not be recognized if . . . in the case of jurisdiction based only on personal service, the foreign court was a seriously inconvenient forum for trial of the action."

This statute is inapplicable to the case at hand because jurisdiction in the English action, while based in part on personal service, was not "based only on personal service." It was also based on Worms' prior agreement to submit to the jurisdiction of the English court, *see* N.Y.Civ.Prac.Law and Rules § 5305(a)(3) (McKinney 1978), and on Worms' voluntary appearance in the English court, *see* N.Y.Civ.Prac.Law and Rules § 5305(a)(2) (McKinney 1978).

■ Furthermore, the English court was not an inconvenient forum. In fact, the transaction on which the Bank sued had more contacts with England than with any other jurisdiction. The transaction originated in England. The parties negotiated and executed the loan and personal guarantee agreements in England. Worms resided in England at the time he entered into the transaction and consented to the jurisdiction of the English court. The agreements provided that they were to be governed by English law. The Bank continued to ad-

---

**3.** Worms could have answered either by paying his solicitors or by making alternative arrangements. He did neither. Worms now contends that he failed to act because he could not afford attorneys fees. That fact, however, even if true, does not affect his due process claim. Worms could have personally attempted to obtain from the English court an additional extension of time to enable him to arrange a means through which to pay his English counsel and thereby protect his interest in the $550,000 liti-

gation. But he did not. Furthermore, Worms "was not a hapless worker threatened with the loss of his job." He was a sophisticated businessman, "well able to defend [his] interests in court, as this litigation amply shows." *United States v. Bedford Associates*, 657 F.2d 1300, 1314 n. 13 (2d Cir.1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982). Significantly, Worms was able to secure counsel in this litigation.

minister the loan through its London office even after Worms moved to New York. Finally, the loan proceeds were used in a ship financing. The ship of course did not have a permanent locus in another jurisdiction. In these circumstances, the English court was a convenient forum in which to litigate.

*The Prospective Third Affirmative Defense*

■ Worms seeks leave to add a third affirmative defense. He would now allege that the English judgment is based on a contract entered into by the Bank in violation of the Trading With the Enemy Act, 50 U.S.C.App. § 1, et seq., and that the judgment should therefore not be recognized because it was rendered to enforce an obligation repugnant to the public policy of the State of New York. *See* N.Y.Civ.Prac.Law and Rules § 5304(b)(4) (McKinney 1978) ("A foreign country judgment need not be recognized if . . . the cause of action on which the judgment is based is repugnant to the public policy of this state").

The Federal Rules of Civil Procedure provide that leave to amend the pleadings should be freely given. Fed.R.Civ.P. 15(a). Nevertheless, leave to amend should not be given in circumstances involving "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis,* 371 U.S. 178, 181, 182, 83 S.Ct. 227, 229, 230, 9 L.Ed.2d 222 (1962).

Worms asserts that "[t]he defense is offered in good faith and the delay in its presentation is the result of its late discovery as investigation by counsel into the law and facts of Plaintiff's underlying claim were made in the course of this litigation." Defendant's Memorandum of Law at 2–3. I grant leave to amend.

I note, however, that on the current state of the record the defense appears to be frivolous. The Bank asserts that it entered into no contracts in connection with the personal guarantee agreement other than the loan agreement, the mortgage agreement and the deed of assignment. The only parties to these several agreements are Worms, Global, Mutiny and the Bank. Worms is a Dutch national who resided in London at the time of the transaction and now resides in New York. Global and Mutiny are both Liberian corporations. The Bank is a Connecticut corporation and maintains an office in London. So far as I am aware, the Trading With the Enemy Act does not prohibit the Bank from entering into these agreements.

> The liberal amendment policy of the Federal Rules was not intended to allow a party to circumvent the effects of summary judgment by amending the [pleading] every time a termination of the action threatens. The time must arrive in every case when [a party opposing summary judgment] must demonstrate that there is a genuine issue for trial or have summary judgment rendered against him.

*Glesenkamp v. Nationwide Mutual Insurance Co.,* 71 F.R.D. 1, 4 (N.D.Cal.1974) Worms is entitled to have his defense adjudicated on the merits. He is not, however, entitled to delay the Bank's enforcement of its judgment by the assertion at this late date of a frivolous defense.

An order will be entered as of October 22, 1982, granting the plaintiff's motion for summary judgment unless prior to that time Worms produces evidence sufficient to raise a substantial question as to the viability of his third affirmative defense.[4]

SO ORDERED.

---

4. Worms is of course also free to submit memoranda in support of his defense.